DA 12-0071

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 258

IN THE MATTER OF:

C.R.,

      Respondent and Appellant.

APPEAL FROM:     District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DI 12-0006
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Robin A. Meguire, Attorney at Law; Great Falls, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General; Kathryn F. Schulz, Assistant
Attorney General; Helena, Montana

          Scott Twito, Yellowstone County Attorney; Kevin C. Gillen, Deputy
County Attorney; Billings, Montana

          Submitted on Briefs:  September 4, 2012

          Decided:  November 13, 2012

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     C.R. appeals the Montana Thirteenth Judicial District Court's order involuntarily committing him to the Montana State Hospital (MSH) and authorizing his involuntary medication. We affirm.

¶2     We address the following issues on appeal:

¶3     1.   *Whether the District Court improperly disregarded C.R.'s hearing testimony.*

¶4     2.   *Whether the District Court's failure to offer C.R. a court-appointed friend violated C.R.'s statutory or constitutional rights.*

¶5     3.   *Whether C.R. received ineffective assistance of counsel.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶6     The District Court involuntarily committed and authorized the involuntary medication of thirty-year-old C.R. after it determined that he suffered from a mental disorder and that his condition met the statutory criteria for involuntary commitment.

¶7     Prior to the commitment proceedings, C.R. resided with his brother, L.R., at L.R.'s residence. According to L.R., on January 8, 2012, C.R. exhibited "bizarre and erratic behavior at the residence, yelling uncontrollably at no one in particular," and L.R. contacted the Billings Clinic Psychiatric Center to check on C.R.'s welfare. Law enforcement transported C.R. to the Billings Clinic Emergency Room, where he became "acutely aggressive" during his mental health evaluation. As a result of these behaviors, Dr. Faraz Masood, M.D., a psychiatric hospitalist at the Billings Clinic Psychiatric Center, requested that the Yellowstone County Attorney's Office file a petition for

2

involuntary commitment. The County Attorney's Office filed a petition on January 9, 2012.

¶8 After reviewing the petition, the District Court found probable cause to believe that C.R. "may suffer from a mental disorder and may need to be committed because of his mental disorder." The District Court appointed counsel to represent C.R., ordered him detained at the Billings Clinic Psychiatric Center pending resolution of the petition, and set an initial hearing on the petition for January 10, 2012. After being advised by counsel of his rights regarding the petition, C.R. waived the initial hearing. The District Court appointed a professional person, Dr. Masood, to evaluate C.R. and set an evidentiary hearing for January 11, 2012.

¶9 On January 10, 2012, Dr. Masood reported to the court that, since his admission to the Psychiatric Center, C.R. "remained labile, aggressive and hostile with disorganized behavior and thoughts." Dr. Masood determined that C.R. suffered from severe psychosis, a mental disorder, and that he needed to be committed because he "cannot adequately care for his needs" and was "an imminent threat to himself." In Dr. Masood's opinion, there was "no recourse but for placement at the state hospital in Warm Springs."

¶10 During the January 11, 2012 evidentiary hearing on the petition, the District Court heard testimony from L.R., Dr. Masood, and C.R. L.R. stated that his brother was not mentally well, appeared to be a risk to himself or others, and currently was unable to care for himself. L.R. was "[a] hundred percent" in support of committing C.R. Dr. Masood agreed that C.R. "poses a risk of imminent harm to himself or others," due to psychosis

3

coupled with schizophrenia. Dr. Masood stated that C.R. had shown little improvement since his admission to the Psychiatric Center, where he had refused medication, spit on staff, and required physical restraints on several occasions to prevent violent behavior. The hospital had to place C.R. in restraints three times and in seclusion twice during his short stay, which Masood testified was unusual. According to Masood, C.R. also continued to experience auditory hallucinations and delusions of paranoia, exhibit manic and impulsive behavior, and lack "insight and judgment . . . to be able to care for himself." Masood testified that, absent treatment, C.R.'s condition would "[m]ost certainly" deteriorate. He recommended a ninety-day commitment to MSH as the "least restrictive placement option" and "if necessary, the involuntary administration of medication" to facilitate C.R.'s treatment.

¶11 The District Court concluded that the State proved to a reasonable degree of medical certainty that "[C.R.] suffers from a mental disorder," namely "psychosis and schizophrenia." It also concluded that the State proved beyond a reasonable doubt that C.R. required commitment in light of his inability to care for himself, the "real risk of harm" he posed to himself and others, and the likelihood that, absent treatment, his "mental health will further deteriorate." The District Court ordered involuntary commitment of C.R. for up to three months and authorized the administration of involuntary medication, if needed "to protect [C.R.] and the public and facilitate effective treatment." C.R. was hospitalized pursuant to the court's order and later released.

4

**STANDARD OF REVIEW**

¶12 We review a district court's order of civil commitment "to determine whether the court's findings of fact are clearly erroneous and its conclusions of law are correct." *In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 14, 359 Mont. 191, 247 P.3d 1100. A finding of fact is clearly erroneous if "it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence or if, after a review of the entire record, we are left with the definite and firm conviction that a mistake has been made." *L.K.-S.*, ¶ 14.

¶13 We require "strict adherence" to the statutory scheme governing involuntary commitment due to the "critical importance" of the constitutional rights at stake. *L.K.-S.*, ¶ 15 (citing *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 16, 325 Mont. 133, 104 P.3d 1065 and *In re Mental Health of T.J.D.*, 2002 MT 24, ¶ 20, 308 Mont. 222, 41 P.3d 323).

¶14 An appeal from an order of involuntary commitment is not moot despite the appellant's release, since the issues are capable of repetition, yet otherwise would evade review. *In re Mental Health of D.V.*, 2007 MT 351, ¶ 32, 340 Mont. 319, 174 P.3d 503.

**DISCUSSION**

¶15 1. *Whether the District Court improperly disregarded C.R.'s hearing testimony.*

¶16 Section 53-21-126, MCA, details the standard of proof, procedural requirements and criteria that a court must apply when considering a petition for civil commitment. The standard of proof in commitment proceedings is "beyond a reasonable doubt with respect to any physical facts or evidence and clear and convincing evidence as to all other

matters." Section 53-21-126(2), MCA. Commitment is appropriate if the court determines, first, that the respondent suffers from a mental disorder and, second, that one of the following criteria has been met:

> (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;

> (b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;

> (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and

> (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

Section 53-21-126(1), MCA; *see* § 53-21-127(7) ("Satisfaction of any one of the criteria listed in 53-21-126(1) justifies commitment pursuant to this chapter."). The District Court's decision to commit C.R. was based on its findings under § 53-21-126(1)(a), (b), and (d), MCA, that, due to his mental disorder, C.R. could not care for himself and posed a threat to himself and others, and that his mental condition would further deteriorate if left untreated.

¶17 C.R. contends that, during the evidentiary hearing, "[h]e testified coherently that he did not believe he suffered from a mental disorder and that he had a place to live and could provide for his own basic needs." C.R. posits that his involuntary medication prior

6

to his psychiatric evaluation "caused the symptoms described by Dr. Masood" and resulted in his inability to recollect most events that took place the day before his hearing. C.R. argues that his "lucid" testimony during the evidentiary hearing was "sufficient to create a reasonable doubt as to C.R.'s need for involuntary commitment or at the very least render Dr. Masood's testimony regarding C.R.'s need for commitment not 'clear and convincing.'"

¶18 We review for clear error the District Court's determination that C.R. suffers from a mental disorder and that he meets the criteria for commitment under § 53-21-126(1), MCA. *In re Mental Health of M.C.D.*, 2010 MT 15, ¶ 9, 355 Mont. 97, 225 P.3d 1214 (we "will disturb the district court's findings in a civil commitment case only if they are clearly erroneous, when viewed in a light most favorable to the prevailing party") (citing *In re C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, 104 P.3d 1065). "We normally defer to a district court's determination of witness credibility and evidentiary weight." *In re G.M.*, 2008 MT 200, ¶ 38, 344 Mont. 87, 186 P.3d 229 (citation omitted).

¶19 The District Court made the following findings based on Dr. Masood's hearing testimony:

> Since his admission, [C.R.] has refused medication, has been in and out of physical restraints, and has been segregated from the general population at the Psychiatric Center because of his propensity towards violence. Currently, [C.R.] is at risk of causing harm to self and others[,] the result of his mental disability. He has spit on other patients. He has been in restraints on a number of occasions and on two occasions directly before this hearing because of concerns of physical confrontations with staff and other patients. [C.R.] has shown no improvement and continues with auditory hallucinations, has delusions of paranoia, demonstrates manic and impulsive behavior and has no judgment or insight into his mental disorder.

The District Court also noted that L.R. testified he believed C.R. was "not mentally well," could not "because of his current mental state, care for himself," and had recently become violent. C.R. does not contest that Dr. Masood's and L.R.'s testimony supported the District Court's findings.

¶20 C.R. contends the District Court "did not even make a credibility finding with respect to C.R.'s testimony," which it "completely ignored." The District Court's written order, however, indicates that it considered C.R.'s testimony and found it unreliable:

> [C.R.] felt that others, not himself, had any issues, or alternatively, matters were not as bad as portrayed. [C.R.] indicated he could reside with his brother or other family members, however the brother indicated that placement with him at this time was not acceptable. [C.R.] was not able to grasp the seriousness of his mental disability.

Viewing the evidence in the light most favorable to the State, we conclude the District Court's findings were supported by substantial evidence, the District Court did not misapprehend the effect of the evidence and we are not left with a firm conviction that a mistake has been made. Thus, the District Court's findings were not clearly erroneous.

¶21 2. *Whether the District Court's failure to offer C.R. a court-appointed friend violated C.R.'s statutory or constitutional rights.*

¶22 Prior to 2009, respondents in civil commitment proceedings had a statutory right to a court-appointed friend. Section 53-21-122(2), MCA (2007) ("The judge shall appoint a professional person and a friend of respondent . . ."). In 2009, the Legislature amended § 53-21-122, MCA, which now provides, "If the court finds that an appropriate person is willing and able to perform the functions of a friend of respondent as set out in

8

this part and the respondent personally or through counsel consents, the court shall appoint the person as the friend of respondent." Section 53-21-122(2)(b), MCA. The statute mandates appointment of a friend only when the court has determined that an appropriate person is willing to perform that function; it does not obligate the court to seek out, investigate, or offer a friend when, as here, none was presented.

¶23 The 2009 amendments were made in response to two decisions of this Court reversing involuntary commitments for failure of the District Court to appoint a friend. *In re Mental Health of J.D.L.*, 2008 MT 445, 348 Mont. 1, 199 P.3d 805; *In re Mental Health of A.S.F.*, 2008 MT 450, 348 Mont. 45, 199 P.3d 808. Though C.R. acknowledges that the statute no longer mandates appointment of a friend to a respondent in civil commitment proceedings, he contends that we recognized in *J.D.L.* and *A.S.F.* the constitutional underpinnings of the right to a court-appointed friend due to the liberty interests at stake. C.R. argues that he had "a right to at least be *offered* a court appointed friend" and the District Court's failure to "investigate, inquire and/or offer C.R. a friend" justifies reversal of its decision. (Emphasis added.)

¶24 C.R. points out that under § 53-21-121(2)(f), MCA, a petition for commitment must include "the name and address of any person whom the county attorney *believes* might be willing and able to be appointed as friend of respondent," and that here, "the Petition merely stated 'unknown.'" (Emphasis added.) The permissive language of the statute does not support an argument that the county attorney is obligated to provide the

name of a willing friend if the county attorney knows of no person willing to assist the respondent.

¶25 While C.R. alleges a due process violation, our decisions in *J.D.L.* and *A.S.F.* were premised on the express language of the statute, which at the time left the district court no discretion. "The mandate of § 53-21-122(2), MCA, to appoint a friend was essentially ignored." *J.D.L.*, ¶ 12. Now, the statute does not provide a mandate. C.R. does not challenge the constitutionality of the current statute, but argues that the court cannot comply with even the permissive language of the statute if "it makes no inquiry into whether such a person exists."

¶26 In both *J.D.L.* and *A.S.F.*, we applied plain error review to the court's failure to follow the requirements of the statute. "We invoke plain error review sparingly and in only those limited situations where failure to review the alleged error may result in a manifest miscarriage of justice or may compromise the integrity of the judicial process." *J.D.L.*, ¶ 6. Here, there was no objection before the District Court to the absence of a court-appointed friend and the record does not indicate whether either the State's attorney or C.R.'s counsel gave consideration to any potential person willing to serve. C.R.'s brother was involved in the proceedings and testified that commitment was in C.R.'s best interest. C.R.'s argument that a friend "could have advocated" for an independent evaluation does not establish that failure to inquire into the possibility of a friend resulted in a manifest miscarriage of justice or compromised the integrity of the proceeding.

10

Since the statute does not mandate appointment of a friend, we decline to invoke plain error review in this case.

¶27   *3. Whether C.R. received ineffective assistance of counsel.*

¶28   We evaluate five "critical areas" in determining whether a respondent received ineffective assistance of counsel in involuntary commitment proceedings: (1) appointment of competent counsel; (2) counsel's initial investigation; (3) counsel's interview with the client; (4) the patient-respondent's right to remain silent; and (5) counsel's role as an advocate for the patient-respondent.  *In re Mental Health of C.R.C.*, 2009 MT 125, ¶ 16, 350 Mont. 211, 207 P.3d 289 (citing *In re Mental Health of K.G.F.*, 2001 MT 140, ¶¶ 70-86, 306 Mont. 1, 29 P.3d 485).  "[U]pon a substantial showing of evidence . . . that counsel did not effectively represent the patient-respondent's interests pursuant to the foregoing standards," we will vacate an order of involuntary commitment.  *C.R.C.*, ¶ 16 (quoting *K.G.F.*, ¶ 91) (internal quotation marks omitted).  We consider the whole record and evaluate each factor "based on the facts and circumstances of the entire case."  *C.R.C.*, ¶ 19.

¶29   C.R. contends that counsel did not adequately represent his interests because counsel "did not obtain an independent professional person to evaluate [him]."  C.R. points out that § 53-21-115(9), MCA, provides "the right to be examined by a professional person of the person's choice when the professional person is willing and reasonably available," but alleges that "C.R. was never offered the option of an independent medical examination."  C.R.'s claim implicates the fifth factor only.  Neither

11

his briefs nor the record as a whole indicate any insufficiency regarding the appointment of competent counsel, counsel's initial investigation, counsel's interview with C.R., or C.R.'s right to remain silent during his hearing.

¶30    As in this case, *C.R.C.* involved a claim of ineffective assistance of counsel based only on the fifth factor. We noted, ". . . it is unclear whether a challenge based only on one of the five 'critical areas' discussed in *K.G.F.* would meet the threshold 'substantial showing of evidence . . . that counsel did not effectively represent the patient-respondent's interests.'" *C.R.C.*, ¶ 19. We recognized, based on *K.G.F.*, that counsel's stipulation to C.R.C.'s commitment without her consent created a presumption of ineffective assistance of counsel. *C.R.C.* ¶ 17. We concluded, however, that the presumption was rebutted by otherwise effective representation—including counsel's cross-examination of the doctor who had concluded C.R.C. posed an imminent threat to herself and others, counsel's attempt to obtain an independent psychological evaluation, his motion to stay execution of the order of involuntary medication, and his notifying the court that he intended to appeal the order. *C.R.C.*, ¶¶ 23-24.

¶31    C.R. cites no authority providing that counsel is *prima facie* ineffective for failing to obtain an independent evaluation. C.R. offers the MSH discharge report as evidence that another evaluation would have created reasonable doubt about the need for commitment. We do not consider that report as substantive evidence because it was prepared after entry of the District Court's commitment order and following eight days of inpatient care and intensive observation, and is a speculative basis upon which to

12

conclude that a second evaluation prior to the hearing would have led to a different outcome.

¶32     As the State points out, the record in this case does not demonstrate that counsel made no effort to obtain an independent examination of C.R., or that C.R. asked for a second opinion.   There are numerous other indications of effective representation. Counsel met with C.R. and Dr. Masood prior to the hearing.   Counsel cross-examined Dr. Masood during the hearing regarding the length of his evaluation of C.R. prior to diagnosing him with schizophrenia and paranoia—twenty to thirty minutes—and regarding C.R.'s disposition the day before the hearing, when, Dr. Masood agreed, he had been "cooperating and giving answers."   We conclude that the record as a whole demonstrates C.R.'s counsel served as "a vigorous advocate for the respondent's wishes." *In re Mental Health of T.J.F.*, 2011 MT 28, ¶ 33, 359 Mont. 213, 248 P.3d 804.

¶33     For the foregoing reasons, the judgment of the District Court is affirmed.


                                        /S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS


13